Case number 20-3577 Carlo Croce v. David Sanders. Oral argument is not to exceed 15 minutes per side. Mr. Galeano for the appellant. Morning. Morning, your honors. My name is Judith Galeano. I'm peering on behalf of the appellant Carlo Croce. I'd like to reserve three minutes for rebuttal. Very well. Thank you. Your honors, for purposes of the argument today, I'd like to focus on one or two of the eight defamatory statements made by the appellee Dr. Sanders regarding Dr. Croce. The first statement is identified as statement 1A in the trial court's opinion and in the party's briefs. It is a statement contained in a November 23, 2016 letter from the New York Times reporter Glantz to Dr. Croce and his employer, The Ohio State University. The second statement is statement 2B, as defined or identified in the trial court's opinion and in the party's briefs. Can you just read what those were? Because I don't really have the reference. I was about to, your honor. I will. The first statement, statement 1A, is states, I'll address it now, image fabrication, duplication, and mishandling and plagiarism in Dr. Croce's papers is routine. That statement, as to be determined by Ohio law, is to be reviewed by a reasonable person's standard. The court, in this case, found that statement to be substantially true. The issue we present is whether or not the statement is substantially true and if it should have been submitted to a jury to determine. Can I ask you a question? Because one way to look at that is whether it's fact or opinion. And I guess where I struggle is it says, the part you left out is Dr. Sanders argues, because in his observation, the image fabrication, duplication, and mishandling and plagiarism in Dr. Croce's papers is routine. It seems to me he's making an argument. And what is routine is often opinion. In other words, whether something is 30 of 1,265 or 800 of 1,265, different people would have different views of what is routine. Well, let me address that in two different ways, Your Honor. As I read this statement and parse it out, Dr. Sanders argues is the preface to the last part, statement 1B of the paragraph, which Dr. Croce is knowingly engaged in scientific misconduct and fraud. That statement, the court in part, the trial court found, was opinion because of the use of the term argues. The intervening statement, the one I'm addressing, is not prefaced by the argument. So I don't, it is a statement of fact. And he used it. OK, so let me ask you about that. Because it says, because in his observation, the fabrication is routine, in the papers is routine. Why isn't what's routine a matter of an opinion? That's what I'm wondering. Well, Your Honor, in that case, and this was not done at the trial court level, there should have been an analysis under the totality of the circumstances test if you were going to find that statement to be an opinion. We don't believe it is. Routine is to be given its ordinary common meaning under Ohio law. And routine means habitual, customary, and regular a pattern in practice. In this case, that specific use of that term created a heightened sense of, a heightened sense in any reasonable reader that you would have an error rate or an issue rate in papers of high frequency. In this case, that rate was only 2.37% out of the total number. I guess it depends on what the denominator is, right? I mean, he had, I think, for purposes of that statement, he had reviewed 30 papers and found mistakes in 27. Is that accurate? Well, Dr. Sanders, in his deposition, couldn't tell you, couldn't identify the number of papers he reviewed. He found 30. It's something like that, right? Well, Your Honor, I disagree. When he was asked the number of papers he reviewed, he said more than 30, but he could not identify the number in his deposition. OK, but presumably not 1,000. I guess my point is that, I mean, isn't there a basis to say that this might be substantially true? Or that a jury couldn't find otherwise, I guess, would be the relevant question. Well, I think, Your Honor, that it is a question of fact to be presented to the jury and to allow the jury to evaluate what Dr. Sanders did review and didn't review and how he made his determination in using the term routine, if you're going to argue it that way. I mean, my position would be, if you're a scientist and you're going to use that language and you invoked the term routine, it creates a very specific image of the number of frequencies of errors. And in this case, Could it also refer to the type of error? I mean, the type of error was the same error, right? That error that was committed was routine. It was the same blot repeating of the blot findings. It wasn't just missed a comma here and missed a period somewhere else. It was the exact same thing that was routinely happening. Or it's not that it happened, it was routine. Well, there were other arguments, not just the blotting. There was also some other arguments that Dr. Sanders raised about text overlap, blots and text overlap, which correlated to the plagiarism statement. If that provides any clarification. So it's not always the same issue arising in the papers. And even if it were, the frequency of it is a question of fact to be determined by a jury, not by the trial court. Can I ask you about that? Because I'm a little confused on the standard of review. So whether something is in fact factual, you would say would be a question maybe for the jury, but whether something is a fact versus opinion, isn't that a question for the court? Yes. Whether it's fact versus opinion is a question for the court. Whether a fact is, whether a statement is a fact and it's true is a question for the jury. Did that answer your question, Your Honor? Yeah, yep. Well, we've skipped to the routine aspect of, and I would say that Dr. Sanders chose his language. He used the specific term routine. By doing that, he created an expectation in a reasonable reader. And a reasonable reader would not believe, regardless of whether the papers reviewed were 100 or 1,000, that an error rate of 30, or 30 papers with issues, assuming each paper had an issue, as opposed to multiple issues in one paper, would constitute routine errors. Therefore, we believe that the clear impact of the statement imparts that Dr. Croci himself committed the misconduct, which is part of the argument I was going to make, in that the trial court found, in part, that the statement was substantially true because it looked not to Dr. Croci, but Dr. Croci's papers, which would include co-authors. I don't, when you parse out the statement, the letter that contains the statement is addressed just to Dr. Croci and the Ohio State University as employer. I thought the prior sentence in this letter said that, talked about the operations that Dr. Croci oversees, and it said that he exercises little oversight. Are we talking about the same document here? We are, Your Honor. I'm looking at it right now. Okay, so doesn't that put it in a context of kind of a lack of oversight of what other people are doing? And those people are co-authors. And so when we talk about Dr. Croci's papers in the statement you're talking about, we're not talking about, I mean, it's not really only his papers. And it really seems to be an oversight allegation rather than one that he's in there personally doing things wrong. Well, Your Honor, the answer to that is twofold. First, that paragraph is contained in there, but that doesn't necessarily mean that Dr. Croci hadn't also himself authored papers first. Second, if you read the third paragraph, a reasonable reader in context of this letter in its entirety would see the question that is specific to Dr. Croci. Has Dr. Croci himself made a regular practice of using images incorrectly? Dr. Croci is the head of this lab. He is the dominant controlling figure of the lab. Statements as to his lab or his papers or collaborators necessarily implicate him. And even without specific naming- But that sentence goes on to say, or has he lost control or oversight of the practices within his lab or among his collaborators? So I don't understand. They're just at, this question seems to me, is he doing it himself or is he just losing control of oversight? Am I wrong about that? I think it's asking, is he doing it himself and, or is he losing control over oversight? But at the end of the day- Or has he lost control? It doesn't say and, or. It does not, Your Honor. It says, or has he lost control over the oversight or practices? The issue, I believe, is that the lab is synonymous with Dr. Croci. And the work that comes out of his lab is, ultimately, he is responsible for. He is the dominant figure. Are you conceding that, so it says Dr. Sanders, I want to go back to one other point you made. Dr. Sanders argues that Dr. Croci is knowingly engaging in scientific misconduct and fraud. And I know you didn't want to talk about that, just for a second. So why don't you concede that's opinion if that's just an argument he's making? I don't concede that's an opinion, Your Honor, because I don't believe that the trial court's reliance on the preface of the sentence, what Dr. Sanders argues, is necessarily determinative of whether or not that's an opinion or a statement of fact. Which is what the trial court found. I believe that if you've applied the four-factor analysis to that second statement, statement one, please. If you argue that the light was red, that's your claim, but it's your opinion. You're arguing that the light was red versus saying the light was red. It seems to me the word argues makes it an opinion. Am I wrong? I mean, how would it make it a fact? Well, the word argues is Glantz's word, not Dr. Sanders. Glantz's statement is Dr. Croci is knowingly engaging in scientific misconduct and fraud. No, Glantz's statement is Dr. Sanders argues that Dr. Croci is knowingly engaging in scientific misconduct and fraud. I'm sorry, Glantz put the term Dr. Sanders argues. Dr. Croci, Sanders made the statement, Dr. Croci is knowingly engaging in scientific misconduct and fraud. But wouldn't a reasonable reader construe that, you know, that whole sentence there as we have a factual question here that is subject to dispute, namely whether this stuff is happening, and Sanders' opinion is that the factual question breaks a certain way. That makes it an opinion about the existence of a fact. I don't believe it is an opinion because his language is specific. He has, Sanders has in making these statements identified himself as having a precise meaning. He gives a precise meaning and gives a clear implication of what is happening. He has indicated that he himself has some or implied that he has personal knowledge. And the statements he's made can be verified. I mean, all of this would be true of the light is red as well and judge the par's hypo. I'll give you 15 seconds just to wrap up this point and then you'll have your rebuttal. Okay, thank you, Your Honor. I think, you know, ultimately, Your Honors, really what this whole case comes down to, this court balancing an individual and society's interest in protecting a person's reputation with freedom of expression. And in this case, Dr. Croci has been individually targeted throughout this, throughout both by Dr. Sanders. Dr. Sanders is identified as his leading critic and Dr. Sanders should be held accountable to certain standards when making statements about other scientists. Very well, you'll have your rebuttal. We'll hear from Ms. Kapke. Thank you, Your Honors, and may it please the court. My name is Kara Kapke and I'm here on behalf of Dr. Sanders. And I think Your Honors hit on the very questions that support affirming Judge Graham's decision in this case. I do think there is something very important that Ms. Galeano said today. She talked about how Croci is the figurehead of his lab and the lab is synonymous with Dr. Croci and ultimately he is responsible for what goes on in the papers. And I think that's a very important statement because what Dr. Sanders said is you have these errors that I see with inkblots, with text overlap. I see these errors and I think that I see these errors too frequently. That, Your Honor, as Your Honor has indicated, is precisely that opinion. He also- The fact that he says it happens, this image fabrication, duplication and mishandling and plagiarism happens routinely. And there's only, as far as, maybe I'm misunderstanding this, but even your brief says 30 of over 1,200 papers. How can that be routine or regular? For a couple of reasons, Your Honor, because the routineness is exemplified by what Dr. Sanders reviewed. He reviewed papers and he would see errors often. And like Judge Radler said, the same errors. He would see the problems in control panels in the inkblots. He would see problems with image duplication where you use one control panel at the same time. He'd see those repeatedly. And relatedly, I think what you have is, there's a lot of talk in the briefs about honest error. And you could have honest error and have the corrections of a control panel inkblot, or you have honest error where you have text overlap. But when a scientist is confronted with evidence of that error, and the scientist then does nothing in response to that, doesn't say, yeah, I made a mistake, let's fix it. Let's redo the experiment. Let's correct. Let's add a quotation and prevent the text overlap. When a scientist doesn't do that, that's when it turns into routine, because it's a routine part of their habit to challenge the potential of errors. And so I do think Judge Graham got it right when he said you can't reduce the number of errors to a precise numerical quantification. That, as a matter of law, makes this statement fact. And keep in mind, the question of whether a statement is true or substantially true is a very low threshold for Dr. Sanders to overcome. If you look at the cases- Can I go back to something you said? I mean, I understand the allegations, whether it's routine or not, but there's this other aspect to the argument that is this a claim that the lab generally was making errors and there were unknown scientists who were making them, which then seems less personal to Dr. Croci, or the argument that it was Dr. Croci himself that was intentionally engaging in this wrongdoing. And so the statement in the Glenn's letter says, Dr. Croci is knowingly engaging in scientific misconduct and fraud himself. Like he is actually the one that's creating these errors and then blessing them. And that's similar to the journal Courier article, where it says that Sanders lets Croci falsify data or plagiarize text. Essentially himself. I mean, in some ways, this can be very personal to the doctor himself. I think there's two things there. Dr. Sanders has denied saying Jim Glenn submitted an affidavit that said Dr. Sanders never said that Dr. Croci himself was the bench scientist who manipulated the data. There is no evidence whatsoever that that was ever uttered by Dr. Sanders. And it wouldn't make sense for Dr. Sanders to ever utter such a statement because he told Jim Glenn, he told, you know, you look at the letter, it's full of colleagues and people in the lab. What Dr. Sanders did do is say, I think Dr. Croci is responsible when he doesn't own up to the errors, I think that's misconduct. And that's his opinion. He's saying- I think that he knowingly engaged in scientific misconduct and fraud. That sounds a lot more, I mean, what you said is a much cleaner and maybe more forgiving statement than what he said. When I read knowingly engaging in scientific misconduct and fraud, I'm not thinking he's just overseeing, his oversight is sloppy. I'm thinking he's actually engaged. He's manipulating things. He's doing things. I don't think that's a fair reading at all. And in particular, I don't think that that's, there's any evidence to suggest that. Because here you have Dr. Sanders who has unequivocally stated, I never said Dr. Croci manipulated the data himself. And then he has multiple conversations with Jim Glanz over several days where he talks about lab culture. And he talks about how scientists go through and process these things. It's understood by Jim Glanz through the very article itself, through the letter and through the affidavit that Jim Glanz submitted in this case. If you say he committed a fraud or anyone committed a fraud, why isn't that a statement of fact? Like Judge Sipar committed a fraud. Sounds like a statement of fact. It's implying, you know, my state of mind. Well, I think if you, if I'm implying I know your state of mind, that in and of itself takes it out of a factual question because I can't know your state of mind. Well, what about you're saying, well, you could if I told you what it was, but you're saying he committed a fraud. Why isn't that fact? Statement 1B where Dr. Sanders argues that because you have routine errors and because you have challenged to those errors, you have fraud. What he's saying is, look, there are errors in these papers. I tell the journals about these errors and the authors say, no, there's no errors. There's no errors. I'm denying the existence of these errors. I deny the existence of these errors. Dr. Sanders is saying that in and of itself, in my opinion, I'm arguing that that's misconducted fraud. It's not that Dr. Croci was a bench scientist who performed the experiment, but it's Dr. Sanders value judgment that when a scientist makes an error, when a scientist is confronted with the obviousness of the error, which is not challenged in this case and denies that exist, that error exists, that in and of itself constitutes scientific misconduct. Well, I mean, but I mean, this statement doesn't really tee up a dispute about ethics between the two doctors. It's a dispute about whether Dr. Croci knows or knowingly acted in a certain way. And I mean, isn't Dr. Sanders speaking as a professional here and as somebody who has expert knowledge of this sort of factual question? And I mean, wouldn't a reader say, okay, this guy's a virologist and has a doctorate  based on his expert knowledge that this other guy is doing bad things on purpose. I mean, that sounds like a representation of fact rather than a dispute about where some ethical boundary lies. Respectfully, I disagree because I think where Dr. Sanders' expertise is and is in looking at an inkblot, at looking at a Western blot, at looking at the blot and seeing that, you know what, the lanes three, four, and five, they overlap with lanes six, seven, and eight. That's his expertise. You know, he has those blots permanently blazoned into his head. And that's not been challenged here. The fact that there was that fabrication where three, four, and five overlap with six, seven, and eight has not been challenged. I don't think that there's, other than the reference to Dr. Sanders being a bit of a freelance ethicist and running quixotic campaigns for Congress, you get the sense from how Glantz describes him and how he has testified in this case that he is not someone who is coming to the table with statements of, you know, reference to NIH standards of misconduct. He is making a value judgment that I see a problem and the problem isn't being corrected. And that is ethical misconduct in my mind. And I don't think Dr. Sanders has this particular expertise about ethics other than his own self-proclaimed deciding, being someone who was on the forefront of advocating for better ethics in science. And that's something that he openly admits he's advocating for better ethics. He cares about the scientific record. And that takes him out of this concept of a facts finder with respect to ethics and puts him in the context of an advocate who is passionately trying to make an argument that this is wrong. That when you have- He's sort of interpreting the information. I mean, he's interpreting the information available to him when he says, this guy's doing it on purpose. Is that kind of what you're arguing? That's exactly right. The only thing that I would take issue with is I don't think Dr. Sanders ever said this guy is doing it on purpose. Yeah, I paraphrase. I won't hold you to that. Yeah, because he would never have said that Dr. Croce did it on purpose. What he would say is that by not correcting another scientist who maybe did it on purpose, maybe didn't do it on purpose, but by not correcting that, that's in and of itself misconduct. And that's where you have that opinion. And frankly, I think every single one of Dr. Sanders' statements can have the opinion layer to it because it is one of those things where he's saying, I look at this and this is what I see. So everything he said can be an opinion. And like the district court found, all of his statements can be considered true or substantially true because a statement is not a false statement, even though it is misleading and fails to disclose all relevant facts if the statement has some truth in it. That's the standard for truth versus falsity. It's a low standard for Dr. Sanders to meet. And I think he's met that both for the falsity and for opinion, which is a pure question of law for the court. I think you might've covered your microphone with something there. Oh, I'm sorry. Yeah, that was my binder. That's all right. We could manage for the moment there. Well, and I think I will just defer to your honors if you have other questions. Otherwise, I will just conclude and request that the court affirm the district court's decision. It got it right in concluding that the statements Dr. Sanders made were true or non-verifiable statements of opinion, and that they were also made without any fault on Dr. Sanders' part. Okay. Any further questions from the other judges? Very well. Okay, Ms. Capke, thank you for your argument. We will hear rebuttal from Ms. Galeano. I apologize. Thank you, your honor. I would start with a simple statement. These are personalized comments directed to Dr. Croci. Dr. Sanders is a professor, he's a scientist. He knows that had he wanted to not personalize them, he could have said the cancer and genetics lab at The Ohio State University has authored X number of statements or papers in which there's manipulation, duplication, mishandling of images and plagiarism. He elected not to do that. He chose his words, and he needs to be held and bound by the terms that he used. Contrary to counsel's position, Dr. Sanders does represent himself as an expert in ethics. He teaches a course in ethics, it's in the record. He talks about how he utilizes one of these images as one of his first course classes on showing what he considers to be an ethical issue. Yeah, but ethics, you know, ethical judgments for anyone who's taken ethics, you know, philosophy, I mean, we're not talking about whether the light's red here. You know, we want to talk about cons-categorical imperative, whether that's, you know, we're in the realm of opinion when we're talking about ethics. Well, we are, but we are, there are benchmarks, there are scientific norms, there are scientific measures by which to measure the kind of misconduct that Dr. Sanders references. And he disregards those to make statements that are false. Scientific misconduct is a defined term. Fraud is a defined term as a matter of law, and yet he uses those statements as if they're fact. Counsel also talked about failure of Dr. Croci to make corrections in papers. And that being the impetus for Dr. Sanders' statements. That presumes that Dr. Sanders was accurate in each and every complaint he made. Experts at journals review the complaints and they determine whether or not any complaint made about a paper, is it true or accurate? In this case, not all of the statements made by Dr. Sanders are true. He has- Would you agree if I may, cause we're running out of time here. Would you agree that two people can have a disagreement with regard to whether a specific body of facts  They can disagree. Whether they amount to fraud, I don't agree, your honor. I think- You don't think two jurors could disagree about whether a certain body of facts amounts to fraud or two scientists, you know, two whatever. It's not possible to have any disagreement based on agreed upon facts about whether those facts amount to fraud. In the case where facts are agreed upon, I think that the conclusion would, yes, your honor, I guess it would be possible. However- Well, why isn't that arguably the situation here? We have the slides, there they are. One person thinks that the fact that those slides made it into a paper amounts to fraud. The other one doesn't. Why isn't that our situation? Because there are more statements than just that that is fraud. There are statements of knowingly engaging in misconduct. There are statements that these types of issues with papers are routine. That there are statements that, I mean, the entire eight statements before the court are all issues where Dr. Sanders, he's made them statements of fact. Okay. Can I ask you one question? I'm sorry. Go ahead, please. Just one question before you finish. These cases are really fact specific, so it's kind of hard to find a perfect case, but is MEDA your best case? Is that your best case? As it relates to fact versus opinion, yes, I believe it is, your honor. I think it serves as a good road map for the court. That was a case where the administration of the university criticized a faculty member. And so my instinct is that had a lot of imprimatur of officialness. And so more factual in here, we have a rival professor at a rival university commenting on someone. I thought that was a pretty fair way to distinguish that case. I'm guessing you disagree, but can I get your 30 seconds on why MEDA works well here? I think MEDA works well here because it's really more, I viewed it, your honor, and I believe that it's appropriately viewed as a road map on how to do the analysis of the totality of the circumstances related to each statement made by Dr. Sanders as to whether it's fact or opinion. It gives guidance. I don't think that that case in and of itself, because the statements were made by an investigative committee at a university make it distinguishable. The statements contain the same kind of language. The statements did, even with statements in that case of blatantly and other somewhat hyperbolic terms, the court still found that those statements were statements of fact. And ultimately the analysis goes down to what were they based on? They were based on review and analysis that was verifiable. And in this case, we had papers. And in that case, they did an investigation. Okay, any further questions? Very well. We thank you both for your arguments. The case will be submitted and the clerk may adjourn court. Dishonorable court is now adjourned.